IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DOUGLAS W. TAYLOR, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 3:14-cv-122-NJR-DGW |
| WEXFORD HEALTH SOURCES, INC., PHIL MARTIN, and DR. JOHN COE, | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Now pending before the Court is the motion for summary judgment filed by Defendants John Coe and Wexford Health Sources, Inc. on January 9, 2017 (Doc. 127), and the motion for summary judgment filed by Defendant Phil Martin on January 13, 2017 (Doc. 131). Plaintiff Douglas Taylor filed a combined response to both motions on April 11, 2017 (Doc. 148). For the reasons set forth below, the motions are denied.

### INTRODUCTION

Douglas Taylor ("Taylor"), an inmate currently housed at Big Muddy River Correctional Center is proceeding on a third amended complaint filed pursuant to 42 U.S.C. § 1983 on June 17, 2016. He alleges four claims (Counts 3, 4, 5, and 6) related to the eye care he received while incarcerated at Lawrence Correctional Center beginning on or about June 7, 2012 (Doc. 101). These claims are:

Count 3: Deliberate indifference to a serious medical need against Wexford Health Sources, Inc., for maintaining unconstitutional practices or policies with respect to staffing the optometrist position and procedures for requesting medical care.

Count 4: Deliberate indifference to a serious medical need against Defendant Dr. John Coe for failing to treat Plaintiff's eye condition from June 7, 2012, to the present.

Count 5: Failure to intervene against Defendant Dr. Coe for failing to prevent harm related to his eye condition caused by Dr. Hohenbary's deliberate indifference.

Count 6: Deliberate indifference to a serious medical need against Defendant Phil Martin for failing to treat Plaintiff's eye condition and/or by delaying treatment.[1]

The remaining Defendants now seek summary judgment.

## BACKGROUND

Taylor first sought eye care in June 2012 when he began experiencing sensitivity to light and pain in his eyes. (Doc. 148-1, p. 7; Doc. 148-4, p. 12-13). In his deposition, Taylor testified that he requested nurse sick call in June 2012 for his eye problems by placing the request in the healthcare unit box. Taylor asserts he made more than thirty such requests between June 2012 and June 2013 (Doc. 148-4, p. 13-14). Ten to twenty such requests were specifically addressed to Defendant Martin, the Health Care Unit Administrator ("HCUA") (Doc. 148-1, p. 11). Taylor's medical records, however, do not reflect any treatment for eye pain in 2012 or early 2013 (Doc. 128-1, pp. 2-6). On April 20, 2013, Taylor complained of migraines and was referred to the doctor (Doc. 128-2, p. 1).

Taylor was seen by Dr. Coe on June 4, 2013. He described migraine pain behind and in his eye and that it felt like his eyes would "explode" (Doc. 148-1, p. 7). He reported he may need glasses and was referred to optometry (Doc. 128-2, p. 2).[2] Dr. Coe also prescribed

---

[1] Count 1, which alleged a deliberate indifference claim against Dr. Joshua Hohenbary, was dismissed by stipulation on September 19, 2016 (Doc. 121). Count 2 was dismissed on February 26, 2014, pursuant to 28 U.S.C. § 1915A (Doc. 5).
[2] On July 1, 2013, Taylor complained to his counselor that he requested to see the optometrist, but his requests went unanswered since his transfer to Lawrence in December 2011 (Doc. 148-1, p. 3-4). In a grievance dated

Imitrex (a migraine drug)[3] and Indocin for a 6-month period (although the Imitrex was discontinued 10 days later in favor of the Indocin, which Dr. Coe stated "may work" (Doc. 128-2, p. 3, 5)).[4]

Taylor again was seen by Dr. Coe on September 19, 2013. Taylor reported that the Indocin was working and that when he "popped his neck" his headaches sometimes went away (Doc. 128-2, p. 5). Dr. Coe increased the Indocin dosage (from 25 mg to 50 mg), noted that Taylor was scheduled to see an optometrist, and said that Taylor should return if the headaches did not improve after his vision was checked (*Id*.). During this visit, Taylor told Dr. Coe that he believed he was losing vision and that the medication and "popping" his neck did nothing to resolve the eye pain (Doc. 148-1, p. 8). Dr. Coe told Taylor that the optometrist was busy and that Taylor may be confusing migraines for eye problems, which Taylor did not believe was accurate (Doc. 148-1, p. 8).

From October 3 to October 7, 2013, Taylor sent daily request slips, addressed to Dr. Coe and HCUA Martin, expressing concerns about not receiving eye care and about the pain he was experiencing because of the delay (Doc. 148-1, p. 8). On October 22, 2013, the optometrist (Dr. Hohenbary) indicated that Taylor's appointment needed to be rescheduled because he "ran out of time" and that Taylor's appointment should be rescheduled "ASAP" (Doc. 128-2, p. 8). When Taylor saw Dr. Coe again on November 5, 2013, he again sought to

---

September 11, 2013, Taylor stated he had been requesting eye care for 17 months (Doc. 148-3, p. 2). In a November 7, 2013 grievance, Taylor makes the same statement and complains that he only was placed in line to see the optometrist after he wrote a grievance (but that he still had not seen an optometrist) (Doc. 132-2, p. 6).
[3] Physician's Desk Reference 1474 (63rd ed. 2009).
[4] Dr. Coe states that the Indocin (or Indomethacin) was prescribed for migraine headaches. This drug is an anti-inflammatory typically used to treat pain from osteoarthritis and other arthritic conditions. *Id*. at 2024; MEDLINEPLUS, https://medlineplus.gov/druginfo/meds/a681027.html (last visited Aug. 31, 2017). A search reveals it can also be used to treat "physical stress or exertional headache" and migraines. *See* NATIONAL HEADACHE FOUNDATION, http://www.headaches.org/2007/10/25/indocin-indomethacin/ (last visited Aug. 31, 2017).

see the optometrist. Taylor was told nothing could be done and he needed to write a grievance (Doc. 148-1, p. 8). On this visit, it was noted that Indocin was effective for the migraines (Doc. 128-2, p. 9). On November 20, 2013, Taylor again sought care for headaches "around the eyes" with blurry vision and "put in" to see the eye doctor. (*Id*. at p. 10).

On February 20, 2014, Taylor again saw Dr. Coe and explained that his conditioned had worsened; his eyes were now so sensitive to light that he could not open them outside (Doc. 148-1, p. 9). Dr. Coe prescribed some additional medications including Topamax for what appears to be a 4-week plus 4-day period (Doc. 128-2, p. 11).[5] Dr. Coe conducted a chart review twice in April 2014.[6] (*Id*. at pp. 11-12).

Taylor was finally seen by an optometrist, Dr. Kehoe, on May 16, 2014. Dr. Kehoe ordered glasses for Taylor and told Taylor his eye pressure was three times the normal amount (Doc. 148-1, p. 9; Doc. 128-3, p. 1). The records appear to reveal astigmatism and possible glaucoma (*Id*.). A second examination on June 8, 2014, resulted in orders for further diagnostic testing, including a baseline Pachymetry and visual field test (used to test for glaucoma), scheduled for July 17, 2014 (Doc. 128-2, p. 14). Taylor went to an outside clinic for the tests (*see* Doc. 128-3, p. 4) and was told thereafter that he had an "absolute nasal quadrant defect spreading past the horizontal/midline" (Doc. 148-1, p. 9). Taylor was diagnosed with hypertension glaucoma and told that he had 25% vision loss in his right eye (Doc. 148-1, p. 9).[7] Various medications were prescribed (Doc. 129-3, p. 6) and an "urgent" MRI was

---

[5] It seems that the Topamax was given in dosages that increased over time although the records are not clear to the Court.
[6] There is no indication the Topamax prescription was continued.
[7] According to Wexford Health Source's Ophthalmology Guidelines, most persons with glaucoma are asymptomatic until there is vision loss (Doc. 148-4, p. 31). But symptoms can include "intense pain (that may mimic headaches), nausea/vomiting, photophobia, lacrimation and visual halos seen around light sources" (*Id*.).

requested on July 20, 2014 (Doc. 128-3, p. 7). Dr. Coe reviewed the MRI results with Taylor, which showed no abnormalities (Doc. 128-4, p. 5).[8] According to Taylor, the eye drops prescribed for his glaucoma has lessened his eye pain considerably (Doc. 148-1, p. 9).

Dr. Coe continued treating Taylor's migraine headaches and re-prescribed Topamax on August 11, 2014 (Doc. 128-2, p. 16).[9] At this appointment, Taylor told Dr. Coe that the drug "hurt my eyes." Dr. Coe told Taylor not to worry; the drug causes a little pain that he would have to live with (Doc. 148-1, p. 10). Dr. Coe subsequently told Taylor, on December 1, 2014, to stop taking Topamax (*Id*. 11; Doc. 132-2, p. 61). Three days later, Taylor experienced uncontrollable shaking and falling to the ground, severe pain in his head, episodes of unconsciousness, and uncontrollable bowel movements and urination (Doc. 148-1, p. 11). Taylor sought medical care for these issues but never was called to the healthcare unit (*Id*.). Taylor believes that the symptoms were the result of stopping Topamax suddenly. Dr. Coe saw Taylor again in June 2015 and noted that he only had a "mild headache" at the time (Doc. 132-2, p. 70).

During the relevant time period, Defendant Martin was the Health Care Unit Administrator at Lawrence. Martin does not have a medical degree and does not manage the health care that is provided to inmates. Rather, he ensures that "offenders were generally receiving medical care in accordance with all administrative directives" (Doc. 148-4, p. 2). Martin attested that he has no authority to "direct an offender's medical care," nor did he direct the work of the optometrist or "manage any waiting list of patients to see the

---

[8] The MRI was recommended by Dr. Kehoe, an optometrist. The medical records provided by Defendants do not contain the MRI results.
[9] Again, it appears that the Topamax was given in dosages that increased over time for a 3-month plus 2-week period. Neither the medical records nor the prescription records provided by Taylor are entirely clear (Doc. 148-2).

optometrist" (*Id*). He had the authority to review offender grievances and medical records, however, and would "request staff to schedule" an offender to see a medical professional (*Id*. at p. 3). In particular: "if it appears [from a grievance or through some notification process] that the offender was not being seen by medical staff altogether, I contacted staff to determine why an offender had not been scheduled, and, in such a case, I requested staff to schedule them accordingly" (*Id*.). The person who actually scheduled inmates was Ms. Padgett, who is not a defendant in this action (*Id*.).

Martin did not review any medical request slips, letters, or "kites" that were either addressed to the healthcare unit or to him directly. Rather, they would be reviewed by "nursing staff." (*Id*. at pp. 3-4). Martin did, however, "receive and review offender request slips that specifically related to my job duties" (*Id*. at p. 4). Martin does not recall receiving any correspondence from Taylor related to vision problems or reviewing any grievances, prior to the filing of this lawsuit, that were submitted by Taylor (*Id*. at p. 4).

During the relevant time period, Lawrence's "institutional directive" provided that inmates may request health care through a sick call request form to be placed "in the box located in the housing unit for that purpose" (Doc. 148-5, pp. 24-25). These requests were to be screened by health care staff within 24 hours of receipt, and the inmate was to be scheduled to be treated immediately or scheduled to see a nurse within three days, depending on the severity of the problem. Additional treatment by a doctor would follow thereafter (*Id*. at pp. 26-27). Inmates were directed to address their complaints in writing to the HCUA or the Assistant Warden of Programs (*Id*. at p. 28). In its contract with the Illinois Department of Corrections, Wexford generally agreed to provide optometry and ophthalmology care in a "safe, adequate, and cost-effective manner" (Doc. 148-6, p. 8).

## LEGAL STANDARDS

Summary judgment is proper only if the moving party can demonstrate "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FEDERAL RULE OF CIVIL PROCEDURE 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005); *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 836 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* The Seventh Circuit has stated that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)).

## DISCUSSION

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, a

plaintiff must show first that his condition was "objectively, sufficiently serious" and second that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted).

The following circumstances could constitute a serious medical need: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie County,* 394 F.3d 510, 512-513 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

Second, a prisoner must show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. "Whether a prison official

had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (citations omitted).

A plaintiff does not have to prove that his complaints of pain were "literally ignored," but only that "the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). "Even if a defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 843).

Here, Defendants have not alleged that Taylor's eye condition did not constitute a serious medical need. Accordingly, the Court only considers whether Taylor has made a sufficient showing that Defendants were deliberately indifferent to that serious medical need.

I. **Count 3: Deliberate indifference to a serious medical need against Wexford Health Sources, Inc., for maintaining unconstitutional practices or policies with respect to staffing the optometrist position and procedures for requesting medical care.**

Wexford does not address this count specifically except to argue there was no delay in Taylor's eye care. Wexford contends that Dr. Hohenbary, who initially cancelled Taylor's October 2013 appointment, was not a Wexford employee. Unfortunately, however, Wexford does not support this statement with any citations to the record. Finally, Wexford notes that there was a spike in optometry requests in 2013 (Doc. 128-9, p. 1). Such a spike does not inform the Court of Wexford's policies or whether the optometrist position was sufficiently

staffed. The Court thus declines to address this count given the limited argument presented by Defendant Wexford.

II.  **Count 4: Deliberate indifference to a serious medical need against Defendant Dr. John Coe for failing to treat Taylor's eye condition from June 7, 2012, to the present.**

As Taylor points out in his brief, he is not "suing defendants for any delay in treating his headaches . . . . all counts in this action pertain to eyecare" (Doc. 148, p. 18). Thus, Dr. Coe's treatment of Taylor's migraines is not in dispute. Rather, Taylor claims Dr. Coe failed to take steps to ensure that his eye condition was being treated properly and that he improperly prescribed Topamax, which is contra-indicated for those with glaucoma.

There is no evidence that Dr. Coe was aware of Taylor's eye complaints until he examined Taylor on June 4, 2013. At that time, Dr. Coe referred Taylor to the optometrist. At his September 2013 examination, Dr. Coe noted that Taylor was set to see the optometrist, but by his October 9th examination, Taylor's eyes still had not been examined. Thereafter, Dr. Coe was aware, either through Taylor directly or a review of his medical records, that Taylor did not actually see the optometrist until May 2014—even though his eye condition was progressively worsening. There is no indication in the medical records or otherwise that Dr. Coe did anything to follow up on his referral to the optometrist or otherwise inquire about Taylor's appointment with the optometrist. From October 2013 through May 2014, it seems Dr. Coe ignored Taylor's request for eye care and actively told Taylor that there was nothing he could do.

While Taylor need not show that he was literally ignored, he must show that Dr. Coe's response to his complaints was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Greeno*, 414 F.3d at 653 (quotation

marks omitted). Furthermore, a delay in access to medical care can show deliberate indifference. *See Arnett v Webster*, 658 F.3d 742, 753 (7th Cir. 2011). "The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Mcgowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).

Here, Dr. Coe initially referred Taylor to an optometrist when, in June 2013, Taylor said it felt like his eyes would explode. Dr. Coe then did nothing more to ensure he was actually examined and treated, despite Taylor's continued requests for care and the worsening of Taylor's eye condition. Moreover, when Taylor told Dr. Coe the pain medication was doing nothing to alleviate his eye pain, Dr. Coe did nothing and told Taylor to live with the pain. Based on this evidence, a jury could find that Dr. Coe was deliberately indifferent to Taylor's eye condition.[10] *Arnett*, 658 F.3d at 751 (noting that deliberate indifference is evidenced by "[a] professional's subjective response [that] was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.").

### III. Count 5: Failure to intervene against Defendant Dr. Coe for failing to prevent harm related to his eye condition caused by Dr. Hohenbary's deliberate indifference.

A prison official "can be held liable under § 1983 if [he] (1) had reason to know that a fellow officer was . . . committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). Dr. Coe argues that "[t]here was no reason for Dr. Coe to believe that plaintiff had an urgent or emergent need to see the optometrist. As such, there is no evidence to support the argument that Wexford or Dr. Coe should have known of a purported need to

---

[10] Dr. Coe does not address Taylor's contention that the Topamax was abruptly, and improperly, discontinued and that it caused additional negative symptoms.

intervene, let alone failed to intervene, and there was no clear need to intervene, or were deliberately indifferent to a serious medical need" (Doc. 128- pp. 15-16). Dr. Coe also argues that he did not maintain the eye doctor waiting list. These arguments are not well taken.

As stated above, Dr. Coe believed Taylor's eye condition was sufficiently serious to warrant a referral to an optometrist, but then did nothing more despite Taylor's continued complaints. A simple review of Taylor's medical records revealed that no eye care was scheduled for months after Dr. Coe's referral. A reasonable jury could find that Dr. Coe had the opportunity to intervene because he aware of Taylor's increased complaints, as well as Dr. Hohenbary's failure to schedule Taylor for an examination, and failed to take any action. And, while Dr. Coe may not maintain the optometry waiting list, he certainly could have taken steps to ensure Taylor was examined in a timely manner. Dr. Coe is not entitled to summary judgment on this count.

**IV. Count 6: Deliberate indifference to a serious medical need against Defendant Phil Martin for failing to treat Plaintiff's eye condition and/or by delaying treatment.**

Crediting Taylor's evidence, as the Court must do at this stage of the proceedings, Taylor put in more than thirty requests to receive medical care for his eye pain from June 2012 to May 2014. Ten to twenty of those requests were addressed to Martin. Martin washes his hands of any culpability by arguing that he is not a health professional and could not provide medical care, that he is not responsible for scheduling patients, and that he otherwise had no knowledge of Taylor and his condition. Thus, he argues, he had no personal involvement in any deprivation; he is merely a supervisor, and there is no respondeat superior liability in § 1983 litigation. *See Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015); *Greeno*, 414 F.3d at 653 (stating that a plaintiff must demonstrate that the officials

were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference).

After reviewing the evidence, the Court finds Martin's hands were not so clean. Martin was responsible for ensuring that administrative directives were being followed, directives that required an inmate to be seen by a nurse within three days of making a nurse sick call request. Inmates also were directed to address their complaints to Martin, which Taylor did. That Martin elected to ignore mail directed to him is not an example of delegating responsibility to others, i.e., the "nursing staff." Rather, it is an example of Martin turning a blind eye to the plight of an inmate who was being denied medical care. Non-medical defendants, like Martin, can rely on the medical judgment of medical personnel. *Greeno*, 414 F.3d at 655-656. However, they "cannot simply ignore an inmate's plight." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016). If Taylor's communication to Martin "in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety,'" he can be found to be deliberately indifferent to a plaintiff's serious needs. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996 (quoting *Farmer*, 511 U.S. 837).

While Martin argues that Taylor "cannot provide evidence showing that Phil Martin was aware of any delay" in receiving medical care, Taylor did provide such evidence. In his affidavit, Taylor avers that he sent correspondence to Martin in October 2013 "expressing my concerns about not receiving any eye care, and the pain and suffering caused because of the delay." *See Whitaker v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 685-686 (7th Cir. 2017) ("[W]e have taken pains to reject the misconception that evidence presented in a self-serving

affidavit is never sufficient to thwart a summary judgment motion." (quotation marks and citation omitted)). Taylor also submitted two grievances in 2013 regarding the lack of eye care, and he complained to his counselor in July 2013.

Moreover, Martin had the authority to review offender grievances and to "request staff to schedule" an offender to see a medical professional (Doc. 148-4, p. 2). If it appeared from a grievance that the offender was not being seen by medical staff, he would contact said staff to find out why and to request staff to schedule the inmate for an examination (*Id.*). Here, Taylor complained directly to Martin for nearly two years about not being scheduled to see an optometrist. His complaints were ignored, contrary to prison directives. Based on this evidence, a reasonable jury could find that Taylor's letters to Martin sufficiently alerted him to the risk to Taylor's health, yet Martin turned a blind eye to his complaints.

Martin finally argues that he is entitled to qualified immunity. In determining whether Martin is entitled to qualified immunity, the Court must consider two questions. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and, second, was "the right clearly established?" *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); s*ee also Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). With respect to the second question, the inquiry is specific to the circumstances of the case. "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. A plaintiff has the burden of establishing that a constitutional right is clearly established. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). While a plaintiff need not present a "case directly on point," he must show that "existing precedent must have

placed the statutory or constitutional question beyond debate. *Ashcroft v. al-Kidd*, 563 U.S. 335, 341 (1986).

As set forth above, Taylor has established enough facts for a jury to find that Defendant Martin violated his constitutional rights. And, as the above cases demonstrate, it is clearly established that a prison official may not ignore correspondence seeking adequate medical care. *See Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999); *Vance*, 97 F.3d at 993. Accordingly, Martin is not entitled to qualified immunity.

## Conclusion

For the reasons set forth above, the motion for summary judgment filed by Defendants John Coe and Wexford Health Sources, Inc. on January 9, 2017 (Doc. 127) is **DENIED,** and the motion for summary judgment filed by Defendant Phil Martin on January 13, 2017 (Doc. 131) is **DENIED**. Magistrate Judge Wilkerson is **DIRECTED** to recruit counsel for Plaintiff Douglas Taylor for trial only. A trial date will be set by separate order.

**IT IS SO ORDERED.**

**DATED:  September 18, 2017**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**